## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No.

A.H., by and through her parents Kira Raimondo and Dustin Honeycutt,
  Plaintiff,
v.

TRINIDAD SCHOOL DISTRICT #1,
REBECCA WEBBER,
  Defendants

---

## COMPLAINT AND JURY DEMAND

---

A.H., a minor, by and through her parents, Kira Raimondo and Dustin Honeycutt, by and through counsel Kishinevsky & Raykin, LLC, hereby files this action against Defendants Trinidad School District #1 and Rebecca Webber, in her individual capacity, and states on information and belief as follows. This action seeks damages and costs.

### I.  INTRODUCTION

This case was initiated on behalf of a minor, A.H., and her parents Kira Raimondo and Dustin Honeycutt, concerning serious injuries sustained as a result of Defendants' conduct. A.H. attends Fisher's Peak Elementary, a public elementary school in Defendant Trinidad School District #1 (the "District"). Defendant Rebecca Webber is Vice Principal of Fisher's Peak Elementary.

On January 16, 2025, A.H. suffered serious injury when Defendant Webber dislocated A.H.'s elbow at school. Ms. Raimondo and Mr. Honeycutt advocated for more stringent accommodations and a safety plan following A.H.'s injury. In response, the District downplayed the severity of Defendant Webber's misconduct and reported A.H.'s parents to the Colorado Department of Human Services on allegations of child abuse and neglect. A.H. and her parents

1

bring claims against Defendant District and Defendant Webber individually to vindicate their rights under the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, Equal Protection Clause, and state law.

## II.    JURISDICTION, PARTIES, AND VENUE

1.   The Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and 28 U.S.C. § 1367.

2.   A.H. is a minor resident of Las Animas County, Colorado. A.H. is disabled within the meaning Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq.* and Section 504 of the Rehabilitation act of 1973 ("Section 504"), 29 U.S.C. § 794.

3.   Kira Raimondo and Dustin Honeycutt are A.H.'s parents and are residents of Las Animas County, Colorado.

4.   Trinidad School District #1 is a local school district principally located in Las Animas County, Colorado. The District receives federal funding and is subject to the requirements of the ADA and Section 504.

5.   Rebecca Webber is an Assistant Principal at Fisher's Peak Elementary; a public school located within Trinidad School District #1. On information and belief, Ms. Webber is also a resident of Las Animas County, Colorado.

6.   The wrongful acts alleged herein occurred in whole or in part in Las Animas County, Colorado.

7.   Venue is proper pursuant to 28 U.S.C. § 1391(b) as the wrongful acts alleged by Plaintiff occurred in whole or in part in Colorado.

### III.    FACTUAL ALLEGATIONS

8.   A.H. is a 6-year-old disabled child. She has been diagnosed with Disruptive Mood Dysregulation Disorder ("DMDD").

9.   DMDD is a mood disorder characterized by persistent irritability, and frequent, intense, outbursts.

10. A.H. has also been diagnosed with Disorder of Dysregulated Anger and Aggression of Early Childhood, which is substantially similar to DMDD.

11. A.H.'s DMDD impairs major life activities, such as thinking, working, and communicating.

12. A.H. enrolled in the District at the beginning of the 2024-2025 school year.

13. A.H. started kindergarten at Fisher's Peak Elementary in August 2024.

14. On October 2, 3, and 10,  2024, the District suspended A.H. for misconduct with other students including kicking, pushing, and hitting.

15. A.H. was referred for a special education evaluation soon afterwards, and the District began its evaluation on approximately October 30, 2024.

16. A.H. was found eligible for special education under the Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C § 1400 *et seq.*

17. A.H. receives special education services under the general classification of developmental delay.[1]

---

[1] Developmental delay is a general category of disability for children between 3 and 8, who "experienc[e] developmental delays in one or more of the following areas: physical development, cognitive development, communication development, social or emotional development, or adaptive development . . ."  1 Colo. Code Regs. § 301-8-2.09(13).

18. A.H.'s special education services are provided through an Individualized Education Program ("IEP").

19. The District published A.H.'s IEP on December 17, 2024.

20. Her IEP documents that she displays significant concerns with social/emotional and behavioral functioning, as well as symptoms of hyperactivity, depression, attention problems, atypicality, adaptability, and functional communication deficits.

21. As part of the development of A.H.'s IEP, her parents, Kira Raimondo and Dustin Honeycutt, requested that the District conduct a Functional Behavior Assessment ("FBA") based on A.H.'s impulsive and uncontrolled behaviors.

22. The FBA identified specific behavioral concerns for A.H., such as difficulty remaining seated, trouble keeping her hands to herself, and lack of focus.

23. The FBA also identified that A.H. struggles with accepting directions and completing nonpreferred tasks, which leads to work refusal or resistance to listening to teachers when A.H. is escalated.

24. To address these concerns, the IEP team created a Behavioral Intervention Plan ("BIP").

25. The BIP and FBA were also published on December 17, 2024.

26. A.H.'s BIP identifies specific Setting Event, Antecedent, Behavior Teaching, and Reinforcement Strategies to manage A.H.'s social/emotional wellness and to deter escalations.

27. Specifically relevant strategies include allowing A.H. to move around within her area, breaks with adult supervision, line-of-sight supervision throughout the day, avoiding positive reinforcement of elopement (e.g., running after A.H. during elopement), a Stop, Think, Act, Review, decision-making model, and positive incentives for emotional regulation.

4

28. The FBA also includes a Crisis Intervention Plan to address A.H.'s behaviors that risk harm to herself or others.

29. The Crisis Intervention Plan incorporates similar strategies from her BIP, including giving A.H. space, providing her with breaks, and maintaining line-of-sight supervision.

30. Importantly, the Intervention Plan also includes two explicit requirements that District staff must utilize Crisis Prevention Institute ("CPI") techniques when physically intervening, including when A.H. is upset, eloping, or engaging in aggressive or injurious behaviors to herself or others.

31. CPI provides behavior management and de-escalation training focused on nonviolent crisis intervention. CPI training includes emphasis on safe physical intervention techniques. CPI emphasizes that physical intervention is a last resort.

32. District employees present at the meeting when the IEP was published included Defendant Webber.

33. Accordingly, by December 17, 2024, Defendants had direct, personal knowledge of A.H.'s disability supports and accommodations, including, specifically, the requirement that school staff use CPI techniques when physically intervening.

34. However, on or about January 16, 2025, A.H. suffered a grievous injury when Defendant Webber failed to use CPI.

35. That day, a fire drill occurred, causing A.H. to become dysregulated.

36. While the students stood outside during the fire drill, A.H. grew increasingly dysregulated.

37. As A.H. reentered the school from the drill, Defendant Webber approached her.

38. When Defendant Webber approached, A.H. lashed out, contacting Defendant Webber.

39. Defendant Webber responded by seizing A.H. by her right arm, below the elbow.

40. Defendant Webber then yanked A.H. towards her, dislocating A.H.'s forearm at the elbow.

41. A.H. suffered what is commonly known as "Nursemaid's Elbow" or a "Pulled Elbow."

42. Nursemaid's Elbow occurs when one of the bones in the forearm falls out of position within the elbow joint. The injury is frequently caused when an adult pulls a child by the arm.[2]

43. Nursemaid's Elbow is an emergency condition that causes severe pain and impairs the use of the arm until corrected. Treatment requires a medical professional to return the dislocated bone to its correct position. *Supra* n.2.

44. While correcting the joint is a relatively simple procedure, children who suffer pulled elbows are more likely to suffer it again because the injury stretches the ligaments, increasing their capacity to move out of place. *Supra* n.2.

45. A.H. not only suffered extreme pain from the injury, but also experienced terror and panic from Defendant Webber's use of violence that has left her traumatized and deeply afraid of Defendnat Webber and attending school.

46. Seizing a child by the arm and yanking them upwards does not comply with CPI's emphasis on nonviolent interventions, nor does it comply with CPI's safe physical intervention techniques.

47. Defendant Webber's use of violence indicates that she either knowingly violated CPI techniques or never received CPI training, in violation of A.H.'s BIP.

48. The District failed to provide A.H. with any care for the injury.

---

[2] *See Nursemaid Elbow*, Cleveland Clinic, *available at*
https://my.clevelandclinic.org/health/diseases/22109-nursemaid-elbow

49. Ms. Raimondo and Mr. Honeycutt were not informed of when A.H.'s injury occurred, beyond that it happened on January 16, 2025.

50. The District contacted Ms. Raimondo regarding the injury at between 1:00 and 1:30 PM.

51. Ms. Raimondo and Mr. Honeycutt responded arrived at the school between 1:30 and 1:45 PM.

52. By the time her parents arrived, A.H. had already been injured for at least thirty minutes. *Infra* ¶ 65.

53. When Ms. Raimondo and Mr. Honeycutt responded to the school, they observed A.H. crying in pain.

54. When A.H.'s parents attempted to collect her, Defendant Webber intervened to show them what occurred. Defendant Webber explained that she grabbed A.H. by her *left* arm, and that A.H. fell, causing the injury to her *right* arm.

55. Throughout Defendant Webber's explanation, A.H. remained crying in pain.

56. After collecting A.H., her parents took her directly to the hospital.

57. At the hospital, the emergency medical team identified A.H.'s injury as a Nursemaid's or Pulled Elbow.

58. A.H.'s doctor contradicted Defendant Webber and clarified that Pulled Elbow occurs due to a pull on the arm, rather than a fall.

59. Following the injury, Ms. Raimondo and Mr. Honeycutt kept A.H. home from school as she recovered.

60. The District failed to submit a formal report documenting the injury to the Department of Human Services ("DHS").

7

61. Prior to A.H.'s injury, the District reported Ms. Raimondo and Mr. Honeycutt to the Colorado Department of Human Services ("DHS") for concerns regarding abuse.

62. Ms. Raimondo and Mr. Honeycutt were not informed of any specific underlying conduct related to the report but did receive notice that it was due to injury-related concerns.

63. On January 16, 2025, DHS dispatched several agents to the school to speak with A.H. and her brother.

64. On information and belief, one of these, a trainee, Nick, last name unknown,[3] met with A.H. for approximately 30 minutes to discuss the DHS report.

65. On January 17, 2025, the agents including Nick interviewed Ms. Raimondo and Mr. Honeycutt at their home.

66. When the agents arrived, Ms. Raimondo believed that they had come to discuss A.H.'s elbow injury from the day before.

67. However, the DHS agents were unaware of any such injury and clarified that they had not received any reports of an injury to A.H. on January 16, 2025.

68. After the DHS agents completed their interview regarding the DHS report, they discussed A.H.'s elbow injury with her parents.

69. During that discussion, Nick reported that he had observed A.H. visibly in pain and discomfort during his interview with her the day before. At that time, Nick also informed Ms. Raimondo and Mr. Honeycutt that he had spent approximately 30 minutes with Addelynn and had not observed the school provide her with any medical treatment.

70. Ms. Raimondo and Mr. Honeycutt kept A.H. home from school during her recovery.

---

[3] While Nick's last name is unknown, he was training with Madison Cummings, a DHS caseworker.

71. During A.H.'s recovery, her parents developed a safety plan with the District that included restrictions on Defendant Webber's interaction with A.H.

72. On March 7, 2025, the District confirmed that Defendant Webber would not seek out interactions with A.H.

73. The District also confirmed that Defendant Webber and all special education staff and school administrators received CPI training.

74. On March 14, 2025, the District reconfirmed that Defendant Webber would not be involved in day-to-day support for A.H. and committed to limiting interactions between Defendant Webber and A.H. to urgent situations where other administrative staff are not available on campus.

75. On March 14, 2025, the District also confirmed that *all* staff working with A.H. completed CPI training in January 2025.

76. After the adoption of the safety plan, A.H. returned to school.

77. However, the District and Defendant Webber disregarded the plan on or about June 3, 2025, when Defendant Webber sat very close to A.H. during her kindergarten graduation ceremony.

78. Defendant Webber's presence caused severe emotional distress for A.H.

79. Violations of A.H.'s safety plan occurred again in the 2025-2026 school year.

80. On or about September 18, 2025, A.H. became dysregulated, and school staff were unable to calm her down. Accordingly, staff requested that Ms. Raimondo pick A.H. from school.

81. When Ms. Raimondo arrived to meet with school staff, she discovered that Defendant Webber was conducting the meeting and overseeing the school's response to A.H.'s dysregulation.

82. Under the terms of the safety plan, Defendant Webber is supposed to limit her involvement with A.H. to emergency situations.

83. This was not an emergency situation.

84. Other District staff were present and able to respond to A.H.'s dysregulation.

85. Defendant Webber's direct involvement in removing A.H. from school on or about September 18, 2025, fundamentally violated the safety plan.

## IV.    CLAIMS AND CAUSES OF ACTION

### COUNT I

**Violation of the Americans with Disabilities Act, 42 U.S.C § 12131 *et seq.***
*Against Defendant Trinidad School District #1*

86. Plaintiff incorporates by reference all previous paragraphs of the Complaint as if fully set forth herein.

87. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or actives of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132 (*see also* 28 C.F.R. Part 35).

88. To state a claim under the ADA, a plaintiff must establish that "(1) they are qualified individuals with a disability; (2) they were excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or were otherwise discriminated against by the entity; and (3) such exclusion, denial of benefits, or other discrimination, was by reason of their disabilities." *Douglas Cnty. Sch. Dist. Re-1 v. Douglas Cnty. Health Dep't*, 568 F. Supp. 3d

10

1158, 1164 (D. Colo. 2021) (citing *J.V. v. Albuquerque Pub. Sch.*, 813 F.3d 1289, 1295 (10th Cir. 2016)).

89. A.H. is a person with a disability within the meaning of 42 U.S.C. § 12012.

90. A.H. suffers from DMDD which impairs major life activities such as thinking, working, and communicating.

91. Defendant District receives federal funding and is subject to the requirements of the ADA.

92. Defendant District affirmatively adopted disability accommodations for A.H., including the use of CPI techniques when necessary to make physical contact with A.H.'s person.

93. Defendant District failed to utilize CPI techniques to safely contact A.H.

94. Defendant District's failure to utilize CPI techniques caused Defendant Webber to injure A.H. on January 16, 2025.

95. A.H. suffered a dislocated elbow due to Defendant District's failure to enforce her disability accommodations.

96. A.H.'s injury necessitated emergency treatment and extended time out of school.

97. By injuring A.H. under circumstances that violated her disability accommodations, and that necessitated extended absences, Defendant District excluded A.H. from participating in and from receiving the benefits of Defendant District's public-school programs in violation of the ADA.

98. Defendant District knowingly and intentionally denied A.H. disability accommodations.

99. Defendant District's actions denied A.H. access to its programs and services, solely on the basis of her disability.

100.        As a direct and proximate cause of Defendant District's violations of the ADA, Plaintiff has suffered and continues to suffer severe and grievous physical and mental injuries, emotional distress and suffering, economic damages, and other injuries.

## COUNT II

**Violation of Section 504 of the Rehabilitation Act, 29 U.S.C § 794**
*Against Defendant Trinidad School District #1*

101.        Plaintiff incorporates by reference all previous paragraphs of the Complaint as if fully set forth herein.

102.        Pursuant to Section 504 of the Rehabilitation Act of 1973 ("Section 504") and its regulations "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance . . ." 29 U.S.C. § 794.

103.        Claims under Section 504 are analyzed identically to claims under Title II of the ADA. *Rhodes v. Langston Univ.*, 462 F. App'x 773, 779 (10th Cir. 2011).

104.        To state a claim under Section 504, a plaintiff must establish that "(1) they are qualified individuals with a disability; (2) they were excluded from participation in or denied the benefits of a public entity's services, programs, or activities, or were otherwise discriminated against by the entity; and (3) such exclusion, denial of benefits, or other discrimination, was by reason of their disabilities." *Douglas Cnty. Sch. Dist. Re-1 v. Douglas Cnty. Health Dep't*, 568 F. Supp. 3d 1158, 1164 (D. Colo. 2021) (citing *J.V. v. Albuquerque Pub. Sch.*, 813 F.3d 1289, 1295 (10th Cir. 2016)).

105.        A.H. is a person with a disability within the meaning of the ADA and Section 504.

106.    A.H. suffers from DMDD which impairs major life activities such as thinking, working, and communicating.

107.    Defendant District receives federal funding and is subject to the requirements of Section 504.

108.    Defendant District affirmatively adopted disability accommodations for A.H. including the use of CPI techniques when necessary to make physical contact with A.H.'s person.

109.    Defendant District failed to utilize CPI techniques to safely contact A.H.

110.    Defendant District's failure to utilize CPI techniques caused Defendant Webber to injure A.H. on January 16, 2025.

111.    A.H. suffered a dislocated elbow due to Defendant District's failure to enforce her disability accommodations.

112.    A.H.'s injury necessitated emergency treatment and extended time out of school.

113.    By injuring A.H. under circumstances that violated her disability accommodations, and that necessitated extended absences, Defendant District excluded A.H. from participating in and from receiving the benefits of Defendant District's public-school programs in violation of Section 504.

114.    Defendant District affirmatively acknowledged the risk that A.H. could be seriously injured through staff contact when it developed accommodations specifically requiring the use of CPI techniques.

115.    Defendant District's reckless disregard for that risk when Ms. Webber seized and injured A.H. without utilizing CPI techniques constitutes deliberate indifference to a known risk of harm.

116.    Defendant District knowingly and intentionally violated A.H.'s rights under Section 504.

117.    As a direct and proximate cause of Defendant's violations of Section 504, Plaintiff suffered and continues to suffer severe and grievous physical and mental injuries, emotional distress and suffering, economic damages, and other injuries.

## COUNT III

**Violation of the Colorado Anti-Discrimination Act, C.R.S. § 24-34-801 *et seq.***
*Against Defendant Trinidad School District #1*

118.    Plaintiffs incorporate by reference all previous paragraphs of the Complaint as if fully set forth herein.

119.    The Colorado Anti-Discrimination Act ("CADA") affirms that it is the policy of the State of Colorado "[t]o encourage and enable...individuals with a disability to participate fully in social, employment, and educational opportunities... on the same terms and conditions as individuals without a disability" and "[t]hat...individuals with a disability must not be excluded, by reason of his or her disability, from participation in or be denied the benefits of the services, programs, or activities of any public entity or be subject to discrimination by any public entity." C.R.S. §24-34-801 (1)(a),(d). These rights are codified as a Civil Right in the Colorado Revised Statutes.

120.    Defendant District is a public entity subject to C.R.S. § 24-34-801 *et seq.* per C.R.S. §24-34-301(5.4)(b).

121.    A.H. is an individual with a disability under C.R.S. §24-34-301(7).

122.    Defendant District knew of A.H.'s disabilities and affirmatively adopted accommodations requiring the use of CPI when physically contacting her.

14

123.    Defendant District failed to enforce A.H.'s accommodations, causing her severe physical injury, and requiring extended absences from school.

124.    Defendant District discriminated against Plaintiff in the full utilization of or benefit from the services provide and rendered by Defendants due to the Plaintiff's disability.

125.    As a direct and proximate cause of Defendant's violations of CADA, Plaintiff suffered and continues to suffer severe and grievous physical and mental injuries, emotional distress and suffering, economic damages, and other injuries.

## COUNT IV

**Breach of the Duty of Care Established Under C.R.S. § 24-10-106.3(3)**
*Against Defendant Trinidad School District #1*

126.    Plaintiffs incorporate all previous paragraphs of the Complaint as if fully set forth herein.

127.    C.R.S. § 24-10-106.3, known as the Claire Davis School Safety Act ("CDSSA"), recognizes that "all school districts and charter schools and their employees in this state have a duty to exercise reasonable care to protect all students, faculty, and staff from harm from acts committed by another person when the harm is reasonably foreseeable, while such students, faculty, and staff are within the school facilities or are participating in school-sponsored activities." C.R.S. § 24-10-106.3(3).

128.    Pursuant to C.R.S. 13-17-201(2), this good faith, non-frivolous claim is made for the express purpose of extending the CDSSA, C.R.S. § 24-10-106.3. Plaintiff has found no case law regarding CDSSA's application in circumstances such as those plead herein, and thus, the issues in this complaint present matters of first impression.

129. CDSSA waives sovereign immunity with respect to school districts and charter schools for claims of a breach of duty of care established by the Act arising from an incident of school violence on or after June 3, 2015. C.R.S. § 24-10-106.3(4).

130. An incident of school violence is defined as "an occurrence at a public school or public school-sponsored activity in which a person: (I) engaged in a crime of violence; and (II) the actions...by that person caused serious bodily injury or death to any other person." C.R.S. § 24-10-106.3(2)(c).

131. "'Crime of violence' means that the person committed, conspired to commit, or attempted to commit one of the following crimes: (I) murder; (II) first degree assault; or (III) a felony sexual assault, as defined in section 18-3-402, C.R.S." C.R.S. § 24-10- 106.3(2)(b).

132. A person commits first degree assault if "[w]ith intent to cause serious bodily injury to another person, he causes serious bodily injury to any person by means of a deadly weapon; or [w]ith intent to disfigure another person seriously and permanently, or to destroy, amputate, or disable permanently a member or organ of his body, he causes such an injury to any person." C.R.S. § 18-3-202(1)(a)-(b).

133. Deadly weapon is defined as "(I) a firearm, whether loaded or unloaded; or (II) a knife, bludgeon, or any other weapon, device, instrument, material, or substance, whether animate or inanimate, that in the manner it is used or intended to be used, is capable of producing death or serious bodily injury." C.R.S. § 18-1-910(3)(e).

134. "Objects which are not inherently deadly, such as feet and hands, can become deadly weapons when used to start an unbroken, foreseeable chain of events capable of producing serious bodily injury or death." *People v. Lee*, 476 P.3d 351, 352 (Colo. 2020); *People*

*v. Ross*, 831 P.2d 1310, 1312-14 (Colo. 1992) (establishing that fists can be a deadly weapon if used or intended to be used in a manner capable of producing death or serious bodily injury.)

135.      "'Serious bodily injury' means bodily injury that, either at the time of the actual injury or a later time, involves a substantial risk of death, a substantial risk of serious permanent disfigurement, or a substantial risk of protracted loss or impairment of the function of any part or organ of the body." C.R.S. § 24-10-106.3(2)(f).

136.      Defendant District had a duty under the CDSSA to protect students from reasonably foreseeable harm from incidents of school violence.

137.      It is reasonably foreseeable that a child would suffer a serious bodily injury when an adult grabs and pulls that child by the arm with overwhelming force.

138.      Defendant District had specific knowledge of this risk and affirmative adopted accommodations requiring the use of CPI when physical contacting A.H.

139.      CPI is specifically designed to limit the use of force and to employ only such force that is safe for use with children.

140.      Defendant Webber disregarded the District's affirmative obligation to engage in CPI and used unreasonable and unsafe force.

141.      Defendant Webber dislocated A.H.'s elbow, a serious bodily injury, capable of causing permanent disfigurement or substantial impairment to A.H.'s arm.

142.      A.H.'s arm was temporarily impaired because of the dislocation, and she is now at higher risk of further impairment of the limb due to the stress to her ligaments.

143.      Because Defendant Webber caused A.H. serious bodily injury while intentionally seizing her in violation of her disability accommodations, Defendant Webber's assault on A.H. constitutes first-degree assault under Colorado law.

17

144.     Defendant Weber used her arms in a manner capable of producing serious bodily injury.

145.     Because Defendant Webber engaged in first-degree assault and A.H. suffered serious bodily injury as a result, Defendant Webber's actions qualify as an incident of school violence under the CDSSA.

146.     The incident of school violence was committed after June 3, 2015.

147.     The incident of school violence occurred at school.

148.     The harm caused by Defendant Webber's assault on A.H. was reasonably foreseeable, and thus, Defendant District had a duty to protect A.H. from such harm.

149.     Defendant District adopted affirmative accommodations for A.H. in furtherance of its duty but violated its duty when it failed to protect A.H. from Defendant Webber's reasonably foreseeable incident of school violence and the harm resulting from it.

150.     As a result of Defendant District's violation of its duty of care, A.H. suffered damages.

## COUNT V

### Willful and Wanton Negligence
*Against Defendant Rebecca Webber, in her individual capacity*

151.     Plaintiffs incorporate all previous paragraphs of the Complaint as if fully set forth herein.

152.     To state a claim against a public employee in tort, the plaintiff must allege that there is a waiver of immunity under the Colorado Governmental Immunity Act ("CGIA").

153.     The CGIA provides that public employees are "immune from liability in any claim for injury. . . which lies in tort or could lie in tort . . . and which arises out of an act or omission of such employee occurring during the performance of his duties and within the scope

of his employment unless the act or omission causing such injury was willful and wanton." C.R.S. § 24-10-118(2)(a).

154.    The burden placed on plaintiffs to prove that a public employee has waived their right to immunity is "lenient," as there is no presumption of immunity. *Duke v. Gunnison Cnty. Sheriff's Off.*, 2019 COA 170, ¶ 32.

155.    Colorado courts construe immunity provisions strictly, and waiver provisions broadly. *Maphis v. City of Boulder*, 2022 CO 10, ¶ 17.

156.    A defendant's conduct is willful and wanton if they exhibit "a conscious disregard of the danger." *Martinez v. Est. of Bleck*, 2016 CO 58, ¶ 32.

157.    Pursuant to C.R.S. § 13-17-201(2), this good faith, non-frivolous claim is made for the express purpose of extending the waiver of CGIA immunity, C.R.S. § 24-10-118(2)(a). Plaintiffs has found no case law regarding CGIA's application in circumstances such as those plead herein, and thus, the issues in this complaint present matters of first impression.

158.    Defendant Rebecca Webber has waived her right to immunity because A.H.'s injuries were caused by her willful and wanton conduct.

159.    Defendant Webber exhibited a conscious disregard for A.H.'s safety by failing to employ CPI techniques when contacting A.H., despite affirmative accommodations obligating her to utilize CPI and her own CPI training.

160.    Defendant Webber had direct, personal knowledge of A.H.'s disabilities and the need to employe CPI techniques.

161.    Defendant Webber failed to utilize CPI techniques, causing A.H. serious bodily injury.

162.    Defendant Webber is not entitled to governmental immunity.

163.    To state a willful and wanton negligence claim, a plaintiff must plead: (1) the defendant purposely acted or failed to act; (2) the act or omission was done heedlessly and recklessly, without regard to the rights and safety of the plaintiff. *See* CJI (4th) 9:30.

164.    Defendant Webber's actions were done without regard to A.H.'s rights and safety.

165.    As a result of Defendant Webber's willful and wanton misconduct, Plaintiff suffered and continues to suffer severe and grievous physical and mental injuries, emotional distress and suffering, economic damages, and other injuries.

## V.    PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request the following relief:

A.  Find that the Defendants violated state and federal law;

B.  Find the Plaintiffs are the prevailing party;

C.  Award the Plaintiffs equitable relief;

D.  Award the Plaintiffs punitive damages;

E.  Award the Plaintiffs special damages for medical expenses;

F.  Award the Plaintiffs general damages for emotional distress and pain and suffering in an amount to be established at trial;

G.  Award the Plaintiffs compensatory damages;

H.  Award the Plaintiffs reasonable attorneys' fees and costs under 42 U.S.C. § 1988 and/or other applicable statutes; and

I.  Any other relief deemed necessary or appropriate.

**DATED:** December 18, 2025

*PLAINTIFF REQUESTS A JURY ON ALL ISSUES SO TRIABLE*

20

Respectfully submitted this December 18, 2025.

Kishinevsky and Raykin, LLC
By: *s/Kaity Tuohy*
Igor Raykin
Kaity Tuohy
2581 S. Parker Rd., Ste. 150
(720) 863-4256
igor@coloradolawteam.com
kaity@coloradolawteam.com

***Attorneys for the Plaintiff***